UNITED STATES, Appellee,

v.

Kenneth M. CONLEY, Defendant, Appellant.

No. 98–2181.

United States Court of Appeals, First Circuit.

Heard April 7, 1999.

Decided July 23, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 26, 1999.

Willie J. Davis, with whom Frances L. Robinson, and Davis, Robinson & White, LLP were on brief, for appellant.

S. Theodore Merritt, Assistant United States Attorney, with whom Bill Lann Lee, Acting Assistant Attorney General, Donald K. Stern, United States Attorney, and Sheryl L. Robinson, Trial Attorney, Criminal Section, were on brief, for appellee.

Before TORRUELLA, Chief Judge, SELYA and LYNCH, Circuit Judges.

TORRUELLA, Chief Judge.

The underlying case in this appeal stems from an April 1997 federal grand jury investigation into an incident in which Michael Cox, a plain clothes Boston police officer, was allegedly mistaken for a fleeing suspect and beaten by unknown police officers in violation of 18 U.S.C. § 242. On May 29, 1997, defendant-appellant Kenneth Conley, a Boston police officer at the scene of the incident, testified before the grand jury pursuant to an immunity order. Conley was subsequently convicted of perjury and obstruction of justice as a result of his grand jury testimony and was sentenced to thirty-four months imprisonment and a $6,000 fine. Conley now appeals his conviction.

## BACKGROUND

At approximately 2:30 a.m. on January 25, 1995, a shooting occurred at a restaurant on Blue Hill Avenue in the Grove Hall section of Boston. It was mistakenly broadcast over the police radio that the victim of the shooting was a Boston police officer. The suspects were described as four black males driving a gold Lexus. The mistaken broadcast of a police officer down generated a massive response by police cruisers from several different districts. A chase ensued.

The suspects led the police on a lengthy car chase spanning three police districts and several towns. The closest police vehicle behind the Lexus throughout most of the chase was an unmarked police cruiser occupied by plain clothes officers Craig Jones and Michael Cox. Jones was the driver of the vehicle, and Cox occupied the passenger seat.

The car chase finally ended when the suspects drove down a dead end street known as Woodruff Way in Mattapan. When the suspects arrived at the cul-de-sac at the end of Woodruff Way, the Jones/Cox unmarked cruiser was the first police car on the scene, and skidded to a stop on the left side of the Lexus. The

second police cruiser to arrive was occupied by uniformed officers David Williams and James Burgio. Williams and Burgio pulled in on the right side of the Lexus. Uniformed officer Ian Daley arrived next, and pulled in directly behind the Lexus. Immediately behind Daley was uniformed officer Richard Walker, followed by defendant-appellant Conley and his partner, Robert Dwan. The Conley/Dwan vehicle was thus the fifth police vehicle on the scene. Conley and Dwan wore plain clothes and occupied an unmarked police vehicle.

As the gold Lexus came to a stop at the end of Woodruff Way, Cox observed one of the suspects, later identified as Robert Brown, exit the gold Lexus from the passenger side, and run to the right, towards a fence. In pursuit, Cox exited his vehicle from the passenger side, ran behind the Lexus, and followed the suspect to the right, towards the fence. Cox described the suspect as a black male wearing a brown leather jacket. Cox, also black, was wearing jeans, a black hooded sweatshirt, and a three-quarter length black down jacket.

Cox chased the suspect to the fence, approximately twenty feet away. During the chase, Cox was "about three feet" behind the suspect. (Tr. Vol. II at 31). When the suspect got to the fence, the suspect began climbing over it, catching his jacket for a moment on the top. At that moment, Cox reached up and attempted to grab the suspect and pull him back over the fence. Cox testified that approximately two seconds elapsed between the time that the suspect caught his jacket on the top of the fence and the time when Cox grabbed the suspect's jacket in an attempt to pull him back over the fence. (See Tr. Vol. II at 14, 76). Cox's attempt failed, however, and the suspect dropped down on the other side of the fence and started to run. Cox did not observe anyone else climb over the fence between him and the suspect.

After the suspect landed on the other side, Cox took a step back from the fence, considering for a moment whether to follow over the fence. A moment later, Cox placed both his hands up on the fence, as if to go over. At that point, Cox felt a sharp blow on the back of his head, like a metal pipe. The next thing he knew he was on the ground on his hands and knees, trying to get up. He observed a white male standing in front of him, wearing boots and a dark uniform. Cox was repeatedly kicked in the head, back, face, and mouth by several different people all at once. The beating did not stop until Cox heard someone yell: "Stop, stop, he's a cop, he's a cop." (Tr. Vol. I at 88). When the kicking finally stopped, Cox attempted to get up from the ground. When he looked up, he realized that there was no one around to assist him. Cox was forced to use the bumper of a police car to pull himself up from the ground.

In April 1997, a federal grand jury commenced an investigation into the beating of Officer Michael Cox. The grand jury sought to determine the identity of the officers who attacked Michael Cox and/or deliberately failed to prevent the assault and to get medical attention for him once they knew he was injured. On May 29, 1997, defendant-appellant Conley, an officer present at the scene, was called before the grand jury to recount the events he observed and the actions he took at Woodruff Way in the early morning hours of January 25, 1995.

Consistent with Cox's version of events, Conley testified that when he arrived at the dead end on Woodruff Way, his vehicle was about the fourth or fifth police car in line behind the suspects' gold Lexus, approximately forty feet away. (See Tr. Vol. II at 229–30, 232). Also consistent with Cox's account, Conley testified that once the Lexus skidded to a stop, a black male wearing a brown leather jacket exited from the passenger side of the Lexus and ran to the right, towards a fence. Conley exited his vehicle in pursuit. While in

pursuit, Conley observed the suspect scale the fence, drop down on the other side, and start to run. (*See id.* at 233).

Conley testified that he made all of these observations as he pursued the suspect, beginning from the time the suspect first exited the gold Lexus up to the time when the suspect landed on the other side of the fence and started to run. According to Cox's testimony, Conley made these observations at precisely the same time that Cox was chasing "right behind" the suspect. (Tr. Vol. I at 77).[1] However, before the grand jury, Conley testified that during that time he did not observe anyone—either in plain clothes or in uniform—between him and the suspect. In direct conflict with Cox's account, Conley testified as follows:

Q: All right. Now, officer Conley, when you were chasing the suspect as he went over to the fence, did you see another individual chasing him as well?

A: No, I did not.

Q: Did you see anyone else in plain clothes behind him as he went towards the fence?

A: No, I didn't.

Q: Did you see, as he went on top of the fence or climbed the fence, another individual in plain clothes standing there, trying to grab him?

A: No, I did not.

Q: When you saw the suspect get to the top of the fence, did you see another individual in plain clothes grabbing part of his clothing—

A: No, I did not.

Q: —as he went over the fence?

A: No, I did not.

Q: So that didn't happen; is that correct? Because you saw the individual go over the fence?

A: Yes, I seen [sic] the individual go over the fence.

Q: And if these other things that I've been describing, a second—another plain clothes officer chasing him, and actually grabbing him as he went to the top of the fence, you would have seen that if it happened; is that your testimony?

A: I think I would have seen that.

(Tr. Vol. II at 235–36). Conley further testified that when he got to the fence, he climbed over it in "approximately the same location" that he had observed the suspect go over the fence, and continued in pursuit. (*Id.* at 239). Eventually, after chasing the suspect for approximately one mile, Conley apprehended him and effected an arrest.

Two other individuals, present at the scene, testified at Conley's trial: Officer Walker, and the suspect, Robert Brown. Officer Walker corroborated Cox's version of events up to the point when the suspect climbed over the fence and dropped down on the other side:

Q: Did you see—did Officer Cox reach for the person on the fence?

A: Yes, he did.

Q: What did the person who went over the fence do once they went over the fence?

A: Once he went over the fence, he fell

. . . . .

Q: What did Officer Cox do once the person went over the fence?

A: I don't know.

(Tr. Vol. II at 32). After observing the suspect fall on the other side of the fence, Walker ran from his car straight ahead to a hole in the fence. Walker did not see Cox put his hands on the fence, as if to go over. The last thing Walker saw Cox do was reach for the suspect caught on the fence. (*See id.* at 33).

---

1. Officer Walker corroborated this testimony, placing Cox "about three feet" behind the suspect. (Tr. Vol. II at 31).

Once through the hole in the fence, Walker ran to the right, in pursuit of the fleeing suspect. As he ran, he came upon two white, plain clothes police officers standing in the street. Walker testified that no one had passed by him from the time that he ran through the hole in the fence to the time when he encountered the two white police officers. He did not know where the two officers had come from; he had not observed them jump over the fence. The taller of the two officers asked Walker whether he had a light, and when Walker responded that he did not, the taller officer took off running. Walker followed, approximately two yards behind. (*See* Tr. Vol. II at 67).[2]

During the chase, the tall white officer in front of Walker dropped his radio. Walker stopped to pick up the radio, and then continued in pursuit. When the tall white officer finally apprehended the suspect, Walker returned his radio to him. At trial, Walker testified that the tall white officer was approximately the same height and size as defendant-appellant Conley.

Robert Brown, the suspect wearing the brown leather jacket who was allegedly pursued by both Cox and Conley, also testified at trial. Brown corroborated much of Cox's account. He testified that when the Lexus skidded to a stop at the end of Woodruff Way, he exited the vehicle from the rear passenger side, and headed to the right, towards the fence. He further testified that as he ran towards the fence, he looked back and saw a black man wearing black clothing running behind him. When he arrived at the fence, Brown flipped over it, catching his jacket on the top. Brown stated that as he attempted to free his jacket from the top of the fence,

he felt somebody touch his foot. Once he became free of the fence, Brown fell backwards down a hill, ran into a tree, and split his tooth in half. Dazed and confused, Brown remained on the ground for a moment and observed a black man wearing a "black hoody" start to "go for the fence." (Tr. Vol. II at 97–8). As the man grabbed for the fence, Brown observed a police officer hit the man twice on the back of the head with a billy club or a flashlight, something "shaped like a pipe." (*Id.* at 98). Brown described the police officer as a tall, black man with a mustache, wearing a Boston police uniform and a badge.

Brown next observed a second officer come over to the fence to assist the tall black officer in wrestling the black man to the ground. Once the man was down on the ground, Brown testified that approximately three or four other police officers—uniformed and plain clothes—came over to the fence and began to kick the man. At this point, Brown stood up to run. As he stood up, Brown made eye contact with a tall white officer on the other side of the fence. Brown testified that he did not observe this white officer kick the man on the ground.

Once the tall white officer made eye contact with Brown, Brown began to run, and the white officer followed. Eventually, the white officer caught Brown and arrested him. At trial, Brown testified that the arresting officer was the same tall white officer he had made eye contact with through the fence.

On August 14, 1997, Conley was charged in a three-count indictment arising from his grand jury testimony. Count One charged that Conley committed perjury, in violation of 18 U.S.C. § 1623, by denying

---

2. Walker's testimony that he observed two white police officers standing in the street on the other side of the fence conflicts with Conley's testimony that from the time he jumped over the fence to the time that he apprehended the suspect, he did not have any interaction with any other police officers:

Q: Did you—at any time during that pursuit, was Officer Dwan down there with you?

A: No.

Q: At any time during that pursuit, did you have any interaction with any other police officer?

A: No. I believe I—while I was chasing him, I was on my radio, I believe.

(Tr. Vol. II at 240).

that he saw Cox chase, pursue, and grab hold of a suspect as that suspect ran toward and climbed the fence at Woodruff Way. Count Two charged that Conley also committed perjury by denying that he saw Boston police officers strike and kick Cox. Count Three charged that Conley obstructed and endeavored to obstruct the grand jury investigation by giving false, evasive, and misleading testimony and withholding information, in violation of 18 U.S.C. § 1503. On June 10, the jury returned verdicts of guilty on Counts One and Three and not guilty on Count Two.

## DISCUSSION

On appeal, Conley raises several challenges to his conviction. We address each of his challenges in turn.

### 1. The Testimony of the Grand Juror

Title 18 U.S.C. § 1623 states, in relevant part:

> Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1623. It is uncontested that a conviction under § 1623 requires that the statements made be "material" to the proceeding, here a grand jury investigation. *See id.* It is also uncontested that "materiality" is an element that the government bears the burden of proving. The question presented by defendant-appellant Conley is whether the district court erred in allowing the government to prove this element by calling Jeanne LaBelle, a member of the grand jury that investigated the Cox incident, to testify as to the scope and purpose of the grand jury's investigation. Conley contends that the district court erred in admitting Ms. LaBelle's testimony, and that such error warrants reversal of his conviction. We disagree.

### A. Fed.R.Evid. 606(b)

 Before this court, Conley argues for the first time that the admission of Ms. LaBelle's testimony violated Fed.R.Evid. 606(b).[3] Although Conley objected to the admission of Ms. LaBelle's testimony on other grounds, Conley never raised the applicability of Rule 606(b) before the district court. "Our law is clear that a party ordinarily may not raise on appeal issues that were not seasonably advanced (and, hence, preserved) below." *Cooperman v. Individual, Inc.*, 171 F.3d 43, 50 (1st Cir. 1999) (quoting *Daigle v. Maine Medical Center, Inc.*, 14 F.3d 684, 687 (1st Cir. 1994)). We see no reason to depart from this well-established rule in this case. We thus decline to address Conley's Rule 606(b) argument, except to say that plain error is plainly absent.

### B. Fed.R.Evid. 403

 Conley next claims that the district court erred in admitting Ms. LaBelle's testimony because its probative value was substantially outweighed by the danger of unfair prejudice. *See* Fed. R.Evid. 403. Specifically, Conley argues that the admission of the testimony of a grand juror who voted to return an indictment against him was unfairly prejudicial in that it called upon the petit jury to evaluate the credibility of a grand juror.

**3.** Fed.R.Evid. 606(b) states:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the juror's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Conley contends that because of the "natural tendency" of the petit jury to identify with the grand juror, the petit jury inevitably gave undue weight and credence to Ms. LaBelle's testimony. Conley further argues that the admission of Ms. LaBelle's testimony unfairly prejudiced his case because it caused the jury to confuse the standards of proof governing the grand jury decision to indict and the petit jury decision to convict, respectively.[4] Finally, Conley claims that the government's use of the testimony of a member of the grand jury that returned an indictment against him, violated his presumption of innocence in that it called upon the jury to infer guilt from the fact of his indictment. For all of these reasons, Conley maintains that the admission of Ms. LaBelle's testimony should have been excluded under Fed. R.Evid. 403.

 We review the district court's Rule 403 determination for abuse of discretion. See United States v. Cruz–Kuilan, 75 F.3d 59, 61 (1st Cir.1996). We note that "[o]nly rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." United States v. Saccoccia, 58 F.3d 754, 773 (1st Cir.1995) (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)).

Although the district court did not make express findings with respect to its Rule 403 balancing, it is apparent from the record that the court was aware of its responsibility to balance the probative value of Ms. LaBelle's testimony against its unfairly prejudicial effect. See United States v. Santagata, 924 F.2d 391, 394 (1st Cir.1991) (where pleadings and record evidence show that court was aware of its Rule 403 responsibility, express findings not necessary). As the district court noted, the testimony of Ms. LaBelle was clearly relevant to materiality.[5] Ms. LaBelle testified as to the scope and purpose of the grand jury inquiry:

> We were investigating an assault that took place on Officer Michael Cox on January 25th of 1995, and we were trying to establish the identity of officers who participated in the attack. We were trying to determine if there was excessive force used, and also we were trying to determine who the officers were who deliberately failed to get medical attention once they knew that he had been injured.

(Tr. Vol. III at 114). Ms. LaBelle further testified that defendant-appellant Conley was one of approximately forty-five officers called to testify before the grand jury, and that after Conley's testimony the grand jury did not have any more evidence concerning the identity of the officers who beat Cox or the identity of any witnesses to the beating. Finally, Ms. LaBelle testified that at the time she ended her service as a grand juror, the grand jury had not returned any indictments for the assault of Michael Cox. Ms. LaBelle's testimony was probative in the sense that it provided a context for Conley's allegedly false statements from which the jury could infer

4. The standard of proof governing the grand jury decision to indict is probable cause, while the standard of proof governing the petit jury decision to convict is the much higher standard of proof beyond a reasonable doubt.

5. At a hearing on Conley's motion to preclude Ms. LaBelle's testimony, the district court stated:

And it seems to me also that it is quite clear that it's always been a part of the assumptions that some of the Grand Jury testimony, some of the testimony before the Grand Jury would surely be received because it's a part of what the elements of the crime were, for the government to prove the questions and answers and to prove the other elements of the offense of perjury and obstruction of the administration of justice through obstructing the Grand Jury proceedings.

materiality.[6]

We next consider Conley's assertions of prejudicial effect. Conley offers no evidence to support his theory that the petit jurors were improperly influenced by their sense of identity or "camaraderie" with Ms. LaBelle. Absent such evidence, we cannot conclude that the mere possibility that some sort of bonding occurred between the petit jury and Ms. LaBelle substantially outweighs the probative value of Ms. LaBelle's testimony. Moreover, as the government points out, the petit jury's split verdict undermines Conley's theory of improper influence. *See United States v. Dworken,* 855 F.2d 12, 29 (1st Cir.1988) (jury's acquittal on one count indicates that it was not influenced by potentially prejudicial evidence).

Conley's other claims of unfair prejudice stem from the district court's failure to explicitly instruct the jury with respect to the different standards of proof governing the grand jury's decision to indict and a petit jury's decision to convict. We find no unfair prejudice. Any risk of juror confusion concerning the appropriate standard of proof was minimized by the district judge's thorough instructions concerning the presumption of innocence and the government's burden to prove its case beyond a reasonable doubt.[7] In addition, the district judge made it abundantly clear to the jurors on several different occasions that the indictment returned by the grand jury "is in no sense a part of the evidence that you will consider as you consider whether the government has met its heavy burden of proof of guilt beyond a reasonable doubt." (Tr. Vol. I at 32). Finally, the district judge explicitly requested Conley to submit any additions to the proposed jury instructions "in order to make it clear that in no way does receiving any testimony make the indictment a part of the evidence that the jury is to consider." (Tr. Vol. III at 71). Conley failed to submit any such suggestions and cannot now complain of unfair prejudice.[8]

For the reasons discussed above, we conclude that the district court acted well within its discretion in allowing the government to call Ms. LaBelle to testify as to the scope of the grand jury investigation for the purpose of proving the materiality of Conley's statements.

## C. Fed. R. Crim P. 6(e)(2)

■ Conley next alleges that the district court erred by permitting Ms. LaBelle to testify because the government failed to petition the court in advance for a disclosure order as required by Fed. R.Crim.P. 6(e)(3)(C)(i) & (D).[9] We review

---

6. This court has expressly recognized grand juror testimony as an appropriate and acceptable means of proving materiality in prosecutions brought under § 1623. *See United States v. Nazzaro,* 889 F.2d 1158, 1166 (1st Cir.1990). Other circuits have even gone so far as to express disfavor as to other means of proof on this point. *See, e.g., United States v. Abroms,* 947 F.2d 1241, 1248 (5th Cir.1991) (" '[W]e have generally looked with disfavor on prosecutions brought under Section 1623 that have not used complete transcripts or testimony of members of the grand jury.' ") (quoting *United States v. Cosby,* 601 F.2d 754, 757 (5th Cir.1979)); *United States v. McComb,* 744 F.2d 555, 564 (7th Cir.1984) ("[It] is generally not good procedure to rely on only the defendant's grand jury testimony" to prove materiality under § 1623).

7. Again, the jury's split verdict further undermines Conley's claims of jury confusion with respect to the standard of proof, and the presumption of innocence. *See infra.*

8. The district judge noted Conley's failure to submit instructions on the issue of the grand jury process: "Now, I notice that neither of you asked me in the requested instructions you filed to give instructions that tell the jury something more about the Grand Jury process, but I have drafted some instructions to do that." (Tr. Vol. III at 81).

9. Fed.R.Crim.P. 6(e)(3)(C)(i) states: "Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made—(i) when so directed by a court preliminarily to or in connection with a judicial proceeding."

Fed.R.Crim.P. 6(e)(3)(D) sets forth specific procedures for obtaining an order of disclosure from the court:

Conley's claim *de novo* to the extent that he raises a legal issue with respect to the applicability of Fed.R.Crim.P. 6(e)(3)(C)(i) to the circumstances of this case. *See Civil v. INS*, 140 F.3d 52, 58 (1st Cir.1998).

■ Fed.R.Crim.P. 6(e) codifies the traditional rule of grand jury secrecy. *See* Fed.R.Crim.P. 6(e). Under subsection 6(e)(2) grand jurors, attorneys for the government, and other personnel attached to the grand jury, are prohibited from disclosing matters occurring before the grand jury. *See* Fed.R.Crim.P. 6(e)(2).[10] Of course, there are exceptions to this general rule, *see* Fed.R.Crim.P. 6(e)(3), and the government and Conley disagree with respect to which exception (if any) applies here.

Conley contends that pursuant to subsection 6(e)(3)(C)(i), *see supra* n. 9, the government was required to petition the district court for a disclosure order before calling Ms. LaBelle to testify at trial as to the scope of the grand jury inquiry. Conley argues that the government's failure to comply with the specific procedures set forth in subsection 6(e)(3)(D), *see supra* n. 9, constitutes reversible error. The government asserts that it was under no obligation to petition the court for an order of disclosure because it was entitled under 6(e)(3)(A)(i) to disclosure as a matter of course.[11] We agree with the government.

■ Subsection 6(e)(3)(A)(i) authorizes disclosure as a matter of course, without any court order, to "an attorney for the government for use in the performance of such attorney's duty." Clearly, government attorneys have a duty to prosecute perjury before a grand jury. In the performance of this duty, "it has been standard practice for government attorneys to use the transcript of the grand jury proceedings in preparing a case for trial, refreshing the recollection of government witnesses, impeaching witnesses at trial, and prosecuting for perjury before the grand jury." Wright, 1 Fed. Prac. & Proc.Crim.3d § 107 (1999). No court order is or has been required for this type of disclosure. *See id.; see also United States v. Garcia*, 420 F.2d 309, 311 (2d Cir.1970) ("No purpose would be served by requiring the court to approve a use of grand jury minutes which is implicit in the duties of the United States Attorney."). Although we have found no case law upholding the specific right of government attorneys to similarly call grand jurors to testify as witnesses at trial without prior court approval, we conclude that this means of fulfilling the government attorney's duty also falls within the scope of (A)(i).

■ In this case, Ms. LaBelle disclosed to the government attorney information concerning the scope and purpose of the grand jury inquiry. The purpose of this disclosure was to assist the government attorney in the performance of his duty to prove the materiality of Conley's statements, in order to prosecute perjury before the grand jury. Such use falls squarely within the scope of Rule 6(e)(3)(A)(i) and thus the government was

---

A petition for disclosure pursuant to subdivision (e)(3)(C)(i) shall be filed in the district where the grand jury convened. Unless the hearing is ex parte, which it may be when the petitioner is the government, the petitioner shall serve written notice of the petition upon (i) the attorney for the government, (ii) the parties to the judicial proceeding if disclosure is sought in connection with such a proceeding, and (iii) such other persons as the court may direct. The court shall afford those persons a reasonable opportunity to appear and be heard.

10. Fed.R.Crim.P. 6(e)(2) states, in part: "A grand juror ... an attorney for the government, or any person to whom disclosure is made ... shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules."

11. Subsection (e)(3)(A)(i) states: "Disclosure otherwise prohibited by this rule of matters occurring before the grand jury, other than its deliberations and the vote of any grand juror, may be made to—(i) an attorney for the government for use in the performance of such attorney's duty."

under no obligation to obtain prior court approval.

## 2. The Sufficiency of the Evidence

 The district court's denial of Conley's motion for judgment of acquittal presents a question of law, which we review *de novo*. *See United States v. Czubinski*, 106 F.3d 1069, 1073 (1st Cir.1997). Like the district court, "we scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt." *United States v. Taylor*, 54 F.3d 967, 974 (1st Cir.1995).

 Count One of the indictment charges Conley with knowingly making false material statements before the grand jury with respect to whether he observed an individual later determined to be Officer Michael Cox, "chase, pursue, and grab hold of a suspect as that suspect ran toward and climbed a fence in his attempt to get away from police at or near Woodruff Way ... on January 25, 1995." Count Three of the indictment charges Conley with corruptly endeavoring to obstruct the pending grand jury inquiry by making those false statements. The exchange upon which these accusations are based went as follows:

Q: All right. Now, officer Conley, when you were chasing the suspect as he went over to the fence, did you see another individual chasing him as well?

A: No, I did not.

Q: Did you see anyone else in plain clothes behind him as he went towards the fence?

A: No, I didn't.

Q: Did you see, as he went on top of the fence or climbed the fence, another individual in plain clothes standing there, trying to grab him?

A: No, I did not.

Q: When you saw the suspect get to the top of the fence, did you see another individual in plain clothes grabbing part of his clothing—

A: No, I did not.

Q: —as he went over the fence?

A: No, I did not.

Q: So that didn't happen; is that correct? Because you saw the individual go over the fence?

A: Yes, I seen [sic] the individual go over the fence.

Q: And if these other things that I've been describing, a second—another plain clothes officer chasing him, and actually grabbing him as he went to the top of the fence, you would have seen that if it happened; is that your testimony?

A: I think I would have seen that.

(Tr. Vol. II at 235–36). Conley argues that the government presented insufficient evidence at trial to prove that these statements were false. We disagree.

 The weakness of the government's case lies in the absence of any direct evidence as to what Conley in fact observed during the early morning hours of January 25, 1995 in the cul-de-sac at the end of Woodruff Way. But this weakness is not fatal. As this court has recognized:

Perjury cases, like all criminal cases, are susceptible to proof by circumstantial evidence, and in fact are peculiarly likely to be proven in this manner because one of the elements of the crime is that the defendant knew his statement was false when he made it.

*United States v. Martinez*, 836 F.2d 684, 690 (1st Cir.1988) (quoting *United States v. Chapin*, 515 F.2d 1274, 1278 (D.C.Cir. 1975)). At trial, the government presented ample circumstantial evidence from which a rational jury could conclude that Conley's statements were false beyond a reasonable doubt.

By comparing Conley's testimony about the timing and location of his actions with the testimony of Cox, Walker, and Brown,

the jury reasonably concluded that Conley lied when he stated that he did not observe Cox chasing the suspect. Conley testified that upon arrival at the scene, he observed Brown exit from the passenger side of the Lexus, run to the right, and climb over the fence. Most significantly, Conley testified that "within seconds of seeing [the suspect] go over" the fence he scaled the fence at the same location. (Tr. Vol. III at 15; Vol. II at 239).[12]

■ Both Cox and Walker placed Cox at the exact same time at the exact same place where Conley claims to have climbed over the fence. According to their testimony, which we must view in the light most favorable to the verdict, see *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir.1995), Cox was "right behind" Brown, approximately three feet behind him, as Brown approached the fence. (Tr. Vol. I at 77; Vol. II at 31). When Brown reached the fence, Cox was even closer. At that point, Cox was close enough to make contact with Brown and attempt to pull him back over the fence. Brown corroborated this version of events when he testified that a black man wearing a "black hoody" was behind him as he ran toward the fence and had just started to come over the fence after him when he observed the black man being struck on the head by a police officer. (Tr. Vol. II at 94, 97, 98). Brown confirmed that the person behind him was close enough to make contact with his foot as he scaled the fence. (*See* Tr. Vol. II at 96).

Conley's testimony that he scaled the fence "within seconds" of seeing Brown go over the fence, and that he scaled the fence in the same location as Brown does not square with the testimony of Cox, Walker, and Brown. Conley's version of the events provides for no reasonable gap in time during which he could have missed observing Cox at the fence. Indeed, Conley concedes that if the Cox/Walker/Brown version is true, he would have seen Cox at the fence. (*See* Tr. Vol. II at 236). In reaching its verdict, the jury apparently found the Cox/Walker/Brown version more credible.

■ Our role on review is limited. We must "resolve all credibility disputes in the verdict's favor." *Olbres*, 61 F.3d at 970. Based on the evidence, we find that the jury was entitled to credit the testimony of Cox, Walker, and Brown, and conclude that Conley's statements before the grand jury were false. We thus affirm the district court's denial of Conley's motion for judgment of acquittal with respect to Counts One and Three.

### 3. Fed.R.Evid. 106

Conley next contends that the district court abused its discretion in admitting into evidence excerpts of the transcript of his grand jury testimony, then denying his request to admit the transcript in its entirety for the purpose of placing those excerpts in a proper context as required by Fed.R.Evid. 106.[13] The government

12. Conley's testimony was as follows:
 Q: So your testimony is that you went over the fence within seconds of seeing him go over the fence?
 A: Yeah.
 Q: And in that time, you did not see any black plain clothes police officer chasing him?
 A: No, I did not.
 Q: In fact, no black plain clothes officer was chasing him, according to your testimony?
 A: I did not see any black plain clothes officer chasing him.
 Q: And if he was chasing him, you would have seen it?

A: I should have.
 Q: And if he was holding the suspect as the suspect was at the top of the fence, he as lunging at him, you would have seen that, too?
 A: I should have.
 (Vol. III at 15).

13. Fed.R.Evid. 106 states:
 When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

maintains, however, that despite explicit questioning by the district court, Conley failed to articulate how or why the entire transcript would qualify or explain the excerpts offered by the government.[14] Therefore, the government contends that the district court acted well within its discretion in denying Conley's request.

Under prevailing federal practice, objections to evidentiary rulings must be reasonably specific in order to preserve a right to appellate review. *See United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir.1994) (citing *United States v. Walters*, 904 F.2d 765, 769 (1st Cir.1990)). A litigant's failure to sufficiently articulate the grounds for an objection bars the litigant aggrieved by the ruling from raising more particularized points for the first time on appeal. *See id.*[15] In an attempt to avoid waiver of his Rule 106 argument under this general rule of practice, Conley now maintains that the relevancy of particular portions of his grand jury transcript only became apparent to him after the government's closing arguments.

In his appellate brief, Conley points for the first time to two specific portions of his grand jury transcript that he claims should have been admitted into evidence under Rule 106.[16] The first excerpt contains Conley's testimony that he was interviewed twice by Internal Affairs ("IA") about the Cox incident. Conley argues that this portion should have been admitted into evidence under Rule 106 in order to place in proper context the portions submitted by the government in which Conley testified that he never identified himself to homicide detectives or the district attorney as the arresting officer on the scene on the night of the Cox incident. The government submitted this evidence to suggest that Conley did not want to be identified as a witness to the Cox incident. The problem with Conley's Rule 106 argument is two-fold. First, it is clear from the opening statements that Conley was aware that the government intended to introduce this evidence and to advance this theory of guilt.[17] Thus, we find no reason

14. At a hearing on the Rule 106 issue, the district court instructed defense counsel: "You have to tell me why you think I should admit [the entire transcript]. You see, I'm not giving you a free ride into the Appellate Court, I'm giving you the opportunity to tell me why it's admissible." (Vol. II at 78). Later, after reviewing the entire transcript, the court determined that additional portions were in fact required to be admitted under Rule 106, and supplemented the government's proffer accordingly. At this point, the court again gave defense counsel the opportunity to articulate the basis for admission of the entire transcript:

> THE COURT: Now, the one thing we have not resolved is on what basis you seek to offer the rest of what came after Page 36 as to which I had indicated I didn't see a ground for bringing it in. Did you have something?
>
> DEFENSE COUNSEL: I don't have anything additional, except I rely on Rule 106, and so long as my rights are saved, I'm not going to quarrel with the Judge's ruling. (Vol. II at 159).

15. Of course, even without a sufficient objection, a litigant is entitled to relief on appeal if the evidentiary ruling constitutes plain error. *See Holmquist*, 36 F.3d at 168 n. 15. Plain

errors are "those errors so shocking that they seriously affect the fundamental fairness and basic integrity of the proceedings conducted below." *United States v. Griffin*, 818 F.2d 97, 100 (1st Cir.1987). For the reasons stated *infra*, we find no plain error here.

16. We note that Conley's present ability to cite specific portions of the grand jury transcript that should have been admitted under Rule 106 undermines the argument he advanced below that the district court abused its discretion in refusing to allow the entire transcript.

17. In its opening statement, the government stated that it would present evidence to show that

> after having done all this good police work, the defendant didn't give his name to anyone at the scene, his name doesn't appear on any of the reports, he didn't tell the District Attorney's office that he had arrested Brown, he didn't tell the homicide detectives that he had arrested Brown. The evidence will show that he didn't do that because he didn't want to be involved with having witnessed the beating of a man who was Officer Cox.

to make an exception to our general rule of waiver. Second, even if we did allow Conley to make this argument for the first time on appeal, we are not convinced that the district court's exclusion of this part of the transcript was error. We fail to see how testimony to the effect that Conley was interviewed by Internal Affairs, and wrote a report of the incident pursuant to an order by the IA investigators, adds to the evidentiary value of the admitted excerpts. In our view, a more relevant portion of the transcript from a Rule 106 perspective was Conley's explanation as to why he did not notify the homicide investigators or the district attorney's office of the arrest, and this portion appropriately was introduced into evidence.[18]

■■■ The second portion of his grand jury testimony that Conley claims should have been admitted is testimony concerning Conley's relationship with Officers Burgio and Williams. At trial, the government presented excerpts of Conley's grand jury testimony in order to suggest that Conley lied about his involvement in the Cox incident because he wanted to protect his friends, Officers Burgio and Williams. The government's submitted excerpts, however, included Conley's testimony to the effect that Officer Burgio was not a friend of Conley's, (*See* Tr. Vol. II at 246), and that although Conley became acquainted with Officer Williams at the police academy, he did not socialize or "go out for drinks" with him. (Tr. Vol. III at 10). The inclusion of additional testimony bearing on this issue was not necessary to place the government's excerpts in proper context under Fed.R.Evid. 106.[19]

■■■■ In making determinations as to the completeness of proffered statements, the district court's judgment is entitled to great respect. *See United States v. Houlihan,* 92 F.3d 1271, 1283 (1st Cir. 1996). We conclude that the district court

---

(Vol. I at 45). Defense counsel's opening argument directly addressed this theory advanced by the government:

> There will also be evidence, as the government has pointed out already, that Ken Conley did not take credit for. the arrest, Ken Conley did not write a report. As a matter of fact, Ken Conley's name nowhere appeared in the record as having been involved at all. And there will be evidence presented to you as to why this is so ... And the evidence will clearly show that Ken Conley did not fail to write a report simply because he wanted to avoid being involved in what had gone on while he was chasing Mr. Brown.

(Vol. I at 56–57).

18. The exchange proceeded as follows:

Q: Why was it that you did not then write a report about making an arrest in a murder case?
A: Because it wasn't my call.
Q: Well, whose call, who gave you the directions?
A: No one gave me directions. It was a B–2, B–2 on site or of they got a radio call, however they got it, it's their arrest, I assisted.

Q: Is there a reason why you wouldn't want to claim credit for an arrest of a murder suspect?
A: As I said, we were assisting.

(Vol. III at 5).

19. Conley further argues that the government suggested in its closing argument that Conley's failure to identify himself to both homicide detectives and the district attorney's office somehow affected the outcome of Brown's state court murder trial. In his appellate brief, Conley points to the fact that Walker testified at the state court murder trial and made repeated references to the tall white officer who arrested defendant Ronald Brown. Conley reasons that if the prosecutors believed they needed the tall white officer to testify at Brown's trial, they could easily have determined his identity and called him as a witness. Conley argues that Walker's testimony rebuts the government's theory. However, we have been unable to locate any portions of Conley's grand jury testimony in which he addresses either the fact or content of Walker's testimony at the state court murder trial. Nor has Conley aided our search by citing to the relevant portions. We fail to see how the district court could have abused its discretion in failing to admit portions of the transcript that apparently do not exist.

acted well within its discretion in denying Conley's request that the entire transcript of his grand jury testimony be admitted into evidence.

### 4. The Jury's Request for a Ruler

■ During jury deliberations, the district judge received a note from the jury requesting a ruler. Over Conley's objection, the district judge granted the jury's request, and instructed the jury that the ruler was only to be used on exhibits which contained an approximate scale for measurement.[20] Conley contends that the district judge's decision to provide the jury with a ruler violated his right to confrontation under the Sixth Amendment to the United States Constitution, and requires reversal of his conviction.[21]

At the outset we note our disagreement with the government's characterization of a ruler as merely another generic tool to aid a jury in examining exhibits. A diagram based on an approximate scale contains, by definition, imprecise distances and dimensions. Therefore, pursuant to the district judge's instructions, the jury was using the ruler to obtain more precise information from an exhibit that was imprecise. The use of a ruler under these circumstances is inherently different from the jury's use of a magnifying glass to more clearly observe photographs or fingerprints admitted into evidence. *See, e.g., United States v. George*, 56 F.3d 1078, 1084 (9th Cir.1995) (jury used magnifying glass to examine fingerprint cards and gun); *United States v. Young*, 814 F.2d 392, 396 (7th Cir.1987) (jury used magnifying glass to examine photographs).

The weakness in Conley's argument, however, is that it fails to address the root of the problem: the original admission of

the exhibit containing the approximate scale. At trial, Conley never objected to the admission of Exhibits 7 or 7A, nor does he make such objection on appeal. If, as Conley suggests, the distances and special dimensions of the area at Woodruff Way were critical to the government's charge that Conley must have seen Cox as Conley pursued Brown, Conley should have made a contemporaneous objection to the admission of such an imprecise depiction of the crime scene.

■ A district judge's decision to provide a jury with requested material to aid in its examination of the evidence is reviewed for abuse of discretion. *See United States v. Rengifo*, 789 F.2d 975, 983 (1st Cir.1986). Under the circumstances of this case, we cannot conclude that the district judge abused his discretion in granting the jury's request for a ruler. As the district judge reasoned, once the diagram was admitted into evidence, the jury's request for a ruler was both foreseeable and reasonable. Moreover, even if the request had been denied, there was nothing to prevent the jury from simply making its own, perhaps even more inaccurate, ruler. Therefore, we conclude that the district judge acted within his discretion when he granted the jury's request.

### 5. Sentencing Issues

■ Conley's main claim of sentencing error is that the district court erred in calculating his base offense level by cross-referencing to the sentencing guideline applicable to the underlying offense of aggravated assault. We review the district court's factual determinations under the sentencing guidelines for clear error. *See United States v. Nunez*, 146

---

**20.** There were only two exhibits containing an approximate scale: Government's Exhibits 7 and 7A. Exhibit 7 is a diagram of the cul-de-sac at the end of Woodruff Way, and Exhibit 7A is an overlay upon which Officer Walker placed various vehicles and drew various routes to demonstrate his observations at the scene on the night of the Cox beating.

**21.** The Sixth Amendment states in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI.

F.3d 36, 40 (1st Cir.1998). However, we review the district court's construction of a sentencing guideline and its application of the guideline to the facts *de novo*. *See id.*

The Sentencing Guidelines generally provide a base offense level of twelve for perjury and obstruction of justice. *See* U.S.S.G §§ 2J1.2(a) & 2J1.3(a). However, if the defendant committed perjury "in respect to a criminal offense," or obstructed "the investigation or prosecution of a criminal offense," the Guidelines direct the district court to use a cross-reference and sentence the defendant as an accessory after the fact "in respect to that criminal offense." U.S.S.G. §§ 2J1.2(c)(1) & 2J1.3(c)(1). Pursuant to these provisions, the district court cross-referenced to § 2X3.1, the guideline applicable to those convicted of being accessories after the fact. Section 2X3.1(a) provides a base offense level "6 levels lower than the offense level for the underlying offense." U.S.S.G. § 2X3.1(a). The district court concluded that the "underlying offense" was the violation of constitutional rights by the intentional use of excessive force by police officers, in violation of 18 U.S.C. §§ 241 & 242, and referred to the applicable sentencing guideline found at § 2H1.1. On appeal, Conley does not challenge this initial cross-reference from § 2X3.1(a), to the civil rights guideline found at § 2H1.1. Rather, Conley challenges the district court's subsequent cross-reference from § 2H1.1(a)(1) to the sentencing guideline applicable to the underlying offense of aggravated assault, found at § 2A2.2.[22]

▆▆▆▆ The crux of Conley's argument is that his acquittal on Count Two of the indictment, which charged Conley with ly-

ing about seeing Cox being beaten by Boston police officers, means that the underlying offense for which he is sentenced as an accessory after the fact cannot include the intentional use of excessive force. Conley argues that because he was only convicted of lying about seeing Cox chase the suspect to the fence and grab at him as he scaled the fence, the offense for which he is sentenced as an accessory after the fact should only include the other constitutional deprivations alleged in the indictment: namely, the failure to prevent the assault, and the failure to provide medical care. Because these offenses are not referenced by the guidelines or by statute as separate underlying offenses, but rather are subcategories of the civil rights offense, Conley contends that § 2H1.1(a)(3)—and not § 2H1.1(a)(1)—should apply.[23] We disagree.

▆▆▆▆ Conley's acquittal on Count Two has no bearing on what offenses were under investigation when he testified before the grand jury. As the background section to the obstruction of justice guideline indicates, the cross-reference to § 2X3.1 (the accessory after the fact guideline) is intended to provide an enhanced offense level for the crime of obstruction of justice when the obstruction is in respect to a particularly serious offense. *See* Commentary to U.S.S.G. § 2J1.2(c)(1).[24] Consistent with this purpose, the application of the cross-reference does not depend on the defendant's actual conviction as an accessory after the fact to the offense under investigation. *See United States v. Martinez*, 106 F.3d 620, 621–22 (5th Cir.1997); *United States v. Dicker-*

---

**22.** Section 2A2.2 provides a base offense level of fifteen.

**23.** Section 2H1.1(a)(1) directs the sentencing court to apply the base offense level "from the guideline applicable to any underlying offense." Section 2H1.1(a)(3) sets the base offense level of ten "if the offense involved (A) the use or threat of force against a person; or (B) property damage or the threat of property damage."

**24.** As the background section to § 2J1.3(c)(1) indicates, the cross-reference to § 2X3.1 in the perjury guideline serves the same purpose: "The Commission believes that perjury should be treated similarly to obstruction of justice. Therefore ... an alternative reference to the guideline for accessory after the fact is made." Commentary to U.S.S.G. § 2J1.3(c)(1).

*son,* 114 F.3d 464, 467 (4th Cir.1997); *United States v. Gay,* 44 F.3d 93, 95 (2d Cir.1994).[25] Indeed, application of this cross-reference does not even depend on the defendant's specific knowledge of the underlying offense:

> [A defendant's] lack of knowledge of the specific offenses under investigation is irrelevant. Neither § 2J1.2(c)(1) nor § 2X3.1 requires such knowledge as a prerequisite to application of the offense level for the 'underlying offense.' All that is required is that the 'offense involved obstructing the investigation or prosecution of a criminal offense....' § 2J1.2(c)(1). [The defendant] knew there was a federal grand jury investigation into criminal offenses and that he knowingly and willfully attempted to obstruct it as the jury so found. This is enough to trigger the cross-referencing provisions of the guidelines.

*United States v. McQueen,* 86 F.3d 180, 184 (11th Cir.1996). Conley knew even more than the defendant in *McQueen.* Conley knew that the grand jury was investigating the assault on Michael Cox by Boston police officers, and the trial jury found that he knowingly and willfully obstructed that investigation. The fact that Conley was acquitted on Count Two is irrelevant for cross-referencing purposes.

 ▮ Conley further argues that the use of aggravated assault as the "underlying offense" under § 2H1.1(a)(1) is barred by the plain language of the Commentary to this guideline. The Commentary to § 2H1.1(a)(1) states: " 'Offense guideline applicable to any underlying offense' means the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law." Conley contends that his offenses of conviction are perjury and obstruction of justice, and that the only conduct established by these con-

victions is that he lied before the grand jury about observing Cox chase the suspect as he ran towards the fence. As discussed *supra,* the purpose of the cross-reference in both the perjury and obstruction of justice guidelines is to measure the gravity of those offenses. We conclude that § 2H1.1(a)(1) is similarly employed, and that the sentencing court need not look exclusively to the offense of conviction. This conclusion makes logical sense. As other courts have observed, if the "underlying offense" was required to be the offense of conviction, perjurers and obstructors of justice would benefit from perjury or obstruction that successfully persuaded a grand jury not to return an indictment. *See United States v. Dickerson,* 114 F.3d 464, 468 (4th Cir.1997); *McQueen,* 86 F.3d at 183. The Commentary on which Conley relies relates to the substantive offenses involving individual rights. These notes are not relevant under the circumstances presented here because § 2H1.1 (a)(1) is being used simply as a formula for the perjury and obstruction of justice offenses.

Finally, Conley's argument ignores the specific finding of the district judge that Conley

> observed through his senses of sight and hearing enough to believe that Cox was being struck by other police officers and that his answering in a misleading and incomplete way the questions that were asked before the grand jury was obstructing the grand jury's investigation to determine whether criminal conduct of Boston Police Officers on the scene had occurred.

(Tr. of Disposition Hr'g at 6). We review such factual findings only for clear error. *See Nunez,* 146 F.3d at 40. Based on the evidence presented at trial, *see supra,* this finding does not constitute clear error.

**25.** The plain language of the Commentary supports this interpretation: "Because the conduct covered by this guideline is frequently part of an effort to avoid punishment for an offense that the defendant has committed or to assist another person to escape punishment for an offense, a cross-reference to § 2X3.1 (Accessory After the Fact) is provided." Commentary to U.S.S.G. § 2J1.2(c)(1).

Moreover, this finding further supports the district court's cross-reference to the underlying offense of aggravated assault.

We next address Conley's objections to the district court's application of specific offense characteristics under the aggravated assault guideline. In opposing these enhancements, Conley repeats the argument that his acquittal on Count Two bars the court from enhancing his offense level based on the specific characteristics identified in the aggravated assault guideline. For the same reasons that we uphold the district court's cross-reference to the underlying offense of aggravated assault, we uphold the district court's application of the specific offense characteristics provided for under the same guideline.

Conley raises the same argument with respect to the district court's application of a six level enhancement based on the specific offense characteristic provided for under § 2H1.1(b), namely, that the underlying offense was committed under color of law. Again, for the same reasons that we uphold the district court's initial cross-reference to § 2H1.1(a), we uphold its application of the six level enhancement pursuant to § 2H1.1(b).

 Finally, Conley argues that the district court erred in denying his request for a four level reduction based on his role as a minimal participant in the underlying offenses. *See* U.S.S.G. § 3B1.2(a). In support of his request for such a reduction, Conley argued that the relevant criminal activity was the aggravated assault on Officer Cox. The district court concluded, however, that the relevant criminal activity for purposes of § 3B1.2 was Conley's perjury and obstruction of justice. We agree with the district court. We reiterate that the district court's characterization of the underlying offense as a civil rights violation, and, more specifically, as aggravated assault, was for the limited purpose of measuring the gravity of Conley's perjury and obstruction of justice offenses. For all other purposes, Conley's offenses of conviction remain perjury and obstruction of justice. Clearly, the district court did not err in concluding that Conley was not a "minimal participant" in these criminal activities.

## CONCLUSION

Based on the foregoing, the defendant's conviction is **affirmed**.