**Roger NORTON, Petitioner**

v.

**Luis S. SPENCER, Respondent**

No. CIV.A.01–30070–MAP.

United States District Court,
D. Massachusetts.

March 25, 2003.

to reconsider its decision for the reasons stated in its August 2, 2002 Memorandum and

Order.

Stewart T. Graham, Jr., Hampden, MA, for Roger Norton.

Roger Norton, Gardner, MA, pro Se

William J. Meade, Dean A Mazzone, Attorney General's Office, Boston, MA, for Luis S. Spencer, Respondent.

*MEMORANDUM REGARDING PETITIONER'S FOR WRIT OF HABEAS CORPUS AND RESPONDENT'S MOTION TO DISMISS* (Docket Nos. 1, 20)

PONSOR, District Judge.

## I. INTRODUCTION

*Habeas corpus* petitioner Roger Norton ("Norton" or "petitioner") argues that he has been wrongly imprisoned following his conviction on four counts of indecent assault and battery on a person under the age of fourteen. His arguments can be divided into two categories: (1) that the prosecution's failure to disclose exculpatory evidence violated his rights as set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (2) that the prosecution's failure to provide a bill of particulars violated his right to due process. The respondent has moved to dismiss the petition pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.

As will be seen below, the Commonwealth's apparent failure to provide petitioner crucial exculpatory evidence at his trial clearly violated petitioner's rights as established by *Brady*. Indeed, the apparent concealment of crucial evidence raises serious questions regarding the integrity of the jury verdict. For these reasons, the court will deny respondent's Motion to Dismiss and will allow the petition unless the respondent requests an evidentiary hearing.

## II. *FACTUAL BACKGROUND* [1]

■ All the events leading to the petitioner's conviction for indecent assault and

---

1. According to AEDPA, state court factual findings are "presumed to be correct." 28 U.S.C. § 2254(e)(1). Even where, as here, AEDPA's deferential standard of review is inapplicable, the state courts' factual determinations remain entitled to a presumption of

battery on a person under the age of four-teen allegedly occurred sometime in 1989. At trial, the petitioner was accused of having, on several occasions, sexually assaulted Hector Fuentes ("Fuentes"), then eleven years old. The assaults were said to have occurred at the home of Fuentes' cousin, Jose Colon ("Colon"), and at a trailer park called Sunledge Campground ("Sunledge").

As the facts emerged at trial, Fuentes and petitioner first met at Colon's house, where both were staying as guests, in or around June 1989. During his testimony, Fuentes could not pinpoint the date of this first meeting, although he remembered that it occurred while his mother was in the hospital having a baby.

Fuentes testified that, at some point soon after the two had met, the petitioner approached Fuentes from behind, put his hands on Fuentes' buttocks, picked him up, and said, "This is my boy." (Docket 29, at 3). Fuentes testified further that the petitioner would not put him down despite Fuentes' requests to do so.

The following morning, Fuentes recounted, the petitioner jumped into bed with Fuentes, grabbing Fuentes' genitalia "real hard." *Id.* Fuentes claimed that he immediately left the bedroom, but did not tell anyone what had happened because he was afraid.

Later that summer, Fuentes and his mother resided in a trailer at Sunledge. At that time, the petitioner was also a Sunledge resident.

Fuentes testified at trial that, on one occasion when he went to the petitioner's trailer to retrieve a kite, the petitioner, who was unclothed, pushed Fuentes onto his bed, touched Fuentes' genitalia, and told Fuentes that he wanted to have sex.

Fuentes did not give the petitioner permission to touch him in this manner. He was apparently able to escape Norton without further assault.

At another time that summer, Fuentes testified, the petitioner tackled Fuentes during a game of football. Fuentes testified that, as the two lay on the ground, the petitioner again grabbed and squeezed Fuentes' genitalia.

Fuentes also recounted that, sometime that summer, the petitioner offered Fuentes five dollars to have sex with him and asked Fuentes to go skinny-dipping with him. Fuentes did not accept either proposition.

The last time he saw the petitioner at Sunledge, Fuentes testified, was after discovering his younger cousin, Noel Rodriguez ("Noel"), crying inside the petitioner's camper. After Fuentes threatened to report the petitioner's conduct to Fuentes' parents, the petitioner reportedly expressed indifference. By the following morning, however, the petitioner had disappeared from the campground.

On or about August 16, 1989, Fuentes made a statement to the state police in which he described these alleged sexual assaults. At the same time, Noel also told police that he was indecently assaulted by petitioner.

The petitioner was arrested sometime within the next month.

### III. *PROCEDURAL BACKGROUND*

On September 14, 1989, a Hampden County grand jury indicted the petitioner on six counts of indecent assault and battery on a child under the age of fourteen, five counts pertaining to the alleged assaults on Fuentes, the sixth pertaining to

correctness. *See DiBenedetto v. Hall,* 272 F.3d 1, 7 n. 1 (1st Cir.2001); *Campiti v.* *Matesanz,* 186 F.Supp.2d 29, 41 (D.Mass. 2002).

the alleged assault on Noel. The indictments did not specify the dates of the alleged assaults, only that they occurred prior to August 15, 1989.

Following a pretrial hearing in Massachusetts Superior Court, the trial judge ruled that Noel was not competent to testify at trial. At the hearing, Noel had refused to answer any questions regarding the area of his body where the petitioner had allegedly touched him. Subsequently, the Commonwealth of Massachusetts ("Commonwealth") chose not proceed on the indictment pertaining to Noel, but continued to prosecute the other five indictments pertaining to Fuentes.

At some point, the petitioner filed a motion for a bill of particulars in order to narrow the time period for the alleged assaults. The Commonwealth responded that the incidents occurred sometime in 1988 and 1989.

As there were no other eyewitnesses to any of the alleged assaults, Fuentes was the only person to testify to these incidents at trial. Although Fuentes' testimony did not pinpoint dates for the alleged assaults, the prosecutor later confirmed that they likely occurred in the latter half of 1989, around the time when Fuentes' mother was in the hospital having a child.

On or about August 18, 1992, the petitioner was convicted on four counts of indecent assault and battery on a child under the age of fourteen. The trial judge directed a verdict of not guilty on the fifth count.

The petitioner was sentenced to the following terms of incarceration in state prison: a term of eight to ten years on indictment number 89–5635; a consecutive term of eight to ten years on indictment number 89–5636; a term of three to five years on indictment 89–5634, concurrent with the sentence imposed for indictment 89–5635;

and a term of three to five years on indictment 89–5638, consecutive to the sentence imposed for indictment 89–5636.

On September 28, 1992, the petitioner filed a timely notice of appeal.

On May 14, 1996, the Massachusetts Appeals Court affirmed the conviction in *Commonwealth v. Norton*, 40 Mass.App. Ct. 1121, 664 N.E.2d 883 (1996). On July 9, 1996, the Massachusetts Supreme Judicial Court ("SJC") denied the petitioner's application for leave to obtain further appellate review in *Commonwealth v. Norton*, 423 Mass. 1103, 667 N.E.2d 1159 (1996).

At some point after 1996 the petitioner made two discoveries that he argued constituted "new evidence" within the meaning of 28 U.S.C. § 2245(d)(1)(D).

First, the petitioner found the birth certificate of Fuentes' new sibling, who was born on June 7, 1989. Upon seeing this birth certificate, various members of the Colon household provided affidavits in which they denied that Fuentes had stayed with them during the period surrounding June 7, 1989, as he had stated at trial.

Second, the petitioner asserted that Noel and Noel's mother, Maria Sonia Rodriguez ("Rodriguez"), had told the prosecutor prior to trial that (1) Noel had fabricated his allegations against the petitioner at the insistence of Fuentes, (2) the petitioner had actually done nothing to Noel, and (3) Fuentes had also fabricated his allegations.

Petitioner obtained an affidavit from Noel, in which Noel stated:

I made up the story against [the petitioner] because my cousin Hector [Fuentes] told me to. Hector told me that he had made up a story about [the petitioner] and Hector told me that I had to say that [the petitioner] had done the same things to me. I was not indecently assaulted by Roger Norton. I

made up the story at Hector's insistence.

(Docket 10, Ex. 2).

The petitioner also obtained an affidavit from Rodriguez, which stated, in relevant part:

> During [Fuentes'] childhood, he was a hyperactive child and needed to be medicated to control his hypertension [sic]. I also know that [Fuentes] was a habitual liar and often times . . . stole money from his parents.
>
> Because of [Fuentes'] character traits of lying and stealing, my brother in law and sister Rubin and Maria Colon never allowed [him] to stay at their house without one of his parents being present.
>
> . . . . .
>
> Noel . . . told me that Roger Norton [petitioner] had not touched him or assaulted him and Noel told me he made up the story against [petitioner] because his cousin Hector Fuentes told him to do it. Noel told me that Hector made up the story about [petitioner] and [Fuentes] told Noel that he had to say that [petitioner] had done the same things to him. Noel has told me that he was not indecently assaulted by Roger Norton and Noel made up the story at [Fuentes'] insistence.

(Docket 10, Ex. 5). Rodriguez added that she saw the Assistant District Attorney Susan Loehn and another person named Rivera "repeatedly tell Noel and [Fuentes] exactly what they had to testify to, even after . . . Noel told them that none of it was true, that [Fuentes] had made it all up." *Id.*

It is undisputed that the prosecutor never provided the petitioner with the information contained in the Noel and Rodriguez affidavits.

Petitioner brought this evidence before the state court and moved *pro se* for a new trial on July 9, 1997 before the original trial judge. This motion was denied on January 12, 1998. In rather opaque language, the trial judge made the following findings and rulings:

> The [petitioner] has now filed a motion for a new trial raising the same issues as were raised on the direct appeal or that could have been raised. Attorney Hammersmith, who represented the [petitioner] did an excellent job in cross-examining witnesses and developing any inconsistencies. The incident in the trailer was addressed at trial at some length. The defendant is unhappy at the facts the jury felt were proved. Other matters of "new evidence" were available at the time and could have been introduced or relied on by the defendant if it was in his best interest to do so.
>
> . . . . .
>
> As trial judge at the time I do not feel that any of the issues raised by the [defendant] has merit deserving of a new trial. The defendant got a full fair trial with competent counsel.

(Docket 10, Ex. 9).

On May 31, 2000, the Massachusetts Appeals Court affirmed the denial of the petitioner's motion for a new trial in *Commonwealth v. Norton,* 49 Mass.App.Ct. 1110, 728 N.E.2d 972 (2000). The state appellate court addressed the petitioner's allegations of prosecutorial misconduct as follows:

> Next, the [petitioner] argues that several instances of prosecutorial misconduct warrant a new trial. First, the defendant asserted that the prosecutor committed misconduct by failing to notify defense counsel that she had been informed, prior to trial, that the complainant had admitted he had fabricated the charges against the defendant. In

support of this claim, the defendant offered the affidavits of Noel and Maria Rodriguez stating that Maria had informed the prosecutor that the complainant had told Noel that he had "made up" his story about the defendant. The weight and import of these affidavits were for the trial judge's discretion. *See Com. v. De Christoforo,* 360 Mass. 531, 543, 277 N.E.2d 100. He was not required to accept the statements as true even if they were undisputed. *See ibid.* Thus, the judge could properly determine that these affidavits did not demonstrate any bad faith on the part of the prosecutor. *See Com. v. Fazio,* 375 Mass. 451, 454, 378 N.E.2d 648 (1978) (bad faith will not be presumed); *Com. v. Errington,* 390 Mass. 875, 883, 460 N.E.2d 598 (1984).

Moreover, the affidavits were not those of trial witnesses who later recanted. Rather they were in Noel's case a statement to the effect that the victim told Noel that "he had made up a story" about the [petitioner], and, in the mother, Maria Rodriguez's case, one further level of hearsay removed from the allegedly recanting victim. In light of the fact that much evidence at the trial was equally calculated to discredit the victim [Fuentes], the judge could properly regard the affidavits as largely cumulative in their basic effect. Undisclosed evidence that is cumulative does not normally require a judge to grant a new trial. *See Com. v. Tucceri,* 412 Mass. 401, 414, 589 N.E.2d 1216 (1992).

(Docket 10, Ex. 6, at 5–6).

On November 1, 2000, the SJC denied the petitioner's application for leave to obtain further appellate review in *Commonwealth v. Norton,* 432 Mass. 1110, 738 N.E.2d 354 (2000).

On April 30, 2001, the petitioner filed this petition for a writ of *habeas corpus.*

On March 14, 2002, this court dismissed as time-barred several counts of the petition, which alleged ineffective assistance of counsel, various errors by the trial court, and inadequacies in the indictment. The respondent submitted a final memorandum supporting its motion to dismiss the remaining counts in the petition on November 6, 2002.

## IV. DISCUSSION

### A. Standard of Review

Enacted by Congress in 1996, AEDPA "placed a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." *Williams v. Taylor,* 529 U.S. 362, 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In relevant part, AEDPA precludes a federal court from granting habeas relief "to any claim that was adjudicated on the merits in State court," unless the relevant state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). Furthermore, AEDPA provides that state-court determinations of factual issues "shall be presumed to be correct" unless the petitioner rebuts the "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In this case, the court must determine whether AEDPA applies when state courts have failed to adjudicate a properly exhausted federal claim. Circuit courts that have spoken on the matter have consistently found that AEDPA does not apply in such circumstances. *See Chadwick v. Janecka,* 312 F.3d 597, 605–07 (3d Cir. 2002); *Norde v. Keane,* 294 F.3d 401, 410

(2d Cir.2002) ("Because the Appellate Division never indicated in any way that it had considered [petitioner's] Sixth Amendment claims, we find that those claims were not adjudicated on the merits, and therefore that the AEDPA's new, more deferential standard of review does not apply."); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir.2002) ("Accordingly, . . . we hold that when it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo."); *Mercadel v. Cain*, 179 F.3d 271, 274–75 (5th Cir.1999) (per curiam).

Similarly, in *Fortini v. Murphy*, 257 F.3d 39 (1st Cir.2001), *cert. denied*, 535 U.S. 1018, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002), the First Circuit made it abundantly clear that a *de novo* standard of review applies to habeas petitions where state courts neglect to address a petitioner's federal claims. *Fortini* itself concerned a defendant who had argued in his appeal to the Massachusetts Appeals Court that the state trial court's decision not to admit disputed evidence violated his constitutional rights under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In affirming the defendant's conviction, the Appeals Court relied exclusively upon Massachusetts evidentiary law, neither addressing the *Chambers* argument nor citing relevant federal authority. Upon review of the defendant's habeas petition, the First Circuit held that a state court must at least *address* a question of federal law for AEDPA to apply.

> Here, the federal claim was never addressed by the state courts. All of the cases that have touched upon this problem (none is directly on point) assume that [AEDPA] applies only when the state court decided the federal issue. After all, AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address.

*Fortini*, 257 F.3d at 47 (citing 28 U.S.C. § 2254(d)); *see also Fryar v. Bissonnette*, 318 F.3d 339 (1st Cir.2003) (citing *Fortini*); *Ellsworth v. Warden, N.H. State Prison*, 318 F.3d 285, 292 (1st Cir.2003) ("In this Circuit, however, the AEDPA deferential standard of review applies only where the state court actually addressed the merits of the petitioner's federal claim."); *Martinez v. Spencer*, 195 F.Supp.2d 284, 298 (D.Mass.2002) (citing *Fortini*).

The facts underlying this case are very similar to those of *Fortini*. Though the petitioner repeatedly asserted in his legal memoranda that the suppression of exculpatory evidence violated his constitutional rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), no state court remotely addressed this federal issue. Indeed, the trial court judge did not even discuss the Noel and Rodriguez affidavits. He simply wrote, "Other matters of 'new evidence' were available at the time and could have been introduced or relied on by the defendant if it was in his best interest to do so." (Docket 10, Ex. 9).

The opacity of this language makes it unclear whether the trial judge even knew of the Noel and Rodriguez affidavits. To say that the defense should have availed itself of evidence that was undisputedly *unavailable* is more than puzzling. Indeed, the information contained in the Noel and Rodriguez affidavits was not of public record, and, absent disclosure by the prosecution, there would have been little reason for defense counsel to interview an alleged victim. The fairest interpretation of the trial judge's reference is that the "new evidence" he mentioned, whatever it was, did not include the affidavits.

The Appeals Court based its ruling on three grounds, none of which directly relates to *Brady*. Applying great deference to the trial judge's ruling, the Appeals Court found that (1) the trial judge could properly determine that the affidavits of Noel and Rodriguez were not credible; (2) the affidavits were likely inadmissable hearsay evidence; and (3) the trial judge could properly determine that the affidavits would be "largely cumulative in their basic effect," since "much evidence at trial was equally calculated to discredit the victim." (Docket 10, Ex. 6, at 5).

None of the Appeals Court's three justifications has any foundation in the trial judge's memo. There is no language in the trial judge's memorandum suggesting that he disbelieved the affidavits, that he found the Noel and Rodriguez affidavits inadmissible hearsay, or that the affidavits, if admitted, would have been cumulative.

Regarding the constitutional claim, only the Appeals Court's unsupported finding that the trial judge might have considered the affidavits to be cumulative conceivably overlaps with the traditional *Brady* inquiry.[2] However, the possibility of overlap is undercut by the absence of language in the trial judge's memorandum suggesting that the affidavits, if admitted, *would* have been cumulative. As will be seen, the evidence summarized in the affidavits was, in important respects, unique, and certainly far more powerful than any other evidence available to the defense. Based on this, the court must find that the Appeals Court did not adjudicate the petitioner's *Brady* claim on the merits. Under *Fortini*, *de novo* review therefore applies.

At oral argument, the respondent vigorously contended that a recent Supreme Court opinion, *Early v. Packer*, —— U.S. ——, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002), *reh'g denied*, —— U.S. ——, 123 S.Ct. 955, 154 L.Ed.2d 854 (2003), implicitly overruled *Fortini*. Thus, AEDPA would apply, according to the respondent, even where the state court *never* addressed the federal issue.

In *Early*, the Supreme Court examined a Ninth Circuit decision that had reversed a federal district court's denial of a habeas petition. The petition concerned a California Supreme Court decision regarding juror coercion that had applied exclusively state law in its analysis, despite federal claims. Nevertheless, in reviewing the habeas petition, the Ninth Circuit summarily assumed that AEDPA's strict standard of review was applicable. *Packer v. Hill*, 277 F.3d 1092, 1100 n. 7 (9th Cir.2002). The Supreme Court agreed with this portion of the Ninth Circuit's analysis,[3] stating that "[t]he jury-coercion claim in respondent's habeas petition is the same claim rejected on the merits in his direct appeal to the state appellate court." *Early*, 123 S.Ct. at 364.

Even if *Early* may possibly be interpreted to suggest that state courts need only address federal claims in terms of analogous state law in order for AEDPA to apply, it would not control this case. No analogous state law whatsoever was addressed here. Moreover, post-*Early* First Circuit decisions have confirmed the continued viability of *Fortini*'s holding. A state court must, in some way, address a petitioner's federal claim before AEDPA's strict standards will control the analysis. Applying *Fortini*, the court finds that the petitioner's *Brady* claim was not adjudicat-

2. Evidence that is merely cumulative is generally rejected as "material" under *Brady*. *See, e.g., Zeigler v. Callahan*, 659 F.2d 254, 266–67 (1st Cir.1981).

3. The Supreme Court ultimately disagreed with the Ninth Circuit's finding that the state court decision was contrary to clearly established federal law, and reversed.

ed on the merits, and will therefore review the petition *de novo*.[4]

### B. *Constitutional Violation: Suppression of Exculpatory Evidence*

[¶] As noted, the petitioner argues that the prosecution failed in its duties under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), when it withheld exculpatory evidence.

[¶] To establish a *Brady* violation, a petitioner must demonstrate that (1) the evidence discovered was material and favorable to the accused; (2) the evidence was suppressed by the state; and (3) the petitioner was prejudiced by the suppression of the evidence and there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *United States v. Conley*, 249 F.3d 38, 45 (1st Cir.2001). This "does not mean that the reviewing court must be certain that a different result would obtain." *United States v. Dumas*, 207 F.3d 11, 15 (1st Cir.2000) (citing *United States v. Cunan*, 152 F.3d 29, 34 (1st Cir.1998)). Rather, a petitioner may prove a *Brady* violation by demonstrating that the "favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

[¶] It is true that evidence inadmissible at trial is immaterial under *Brady*. "Inadmissible evidence is by definition not material, because it never would have reached the jury and therefore could not have affected the trial outcome." *United*

*States v. Ranney*, 719 F.2d 1183, 1190 (1st Cir.1983); *see also Ellsworth v. Warden, N.H. State Prison*, 318 F.3d 285, 310 (1st Cir.2003) (Lipez, J., dissenting).

Here, despite the Appeals Court's finding that the affidavits contained hearsay, the portions of the affidavits relevant to the *Brady* claim—Noel's statement to the effect that he initially fabricated the story of sexual assault at the urging of Fuentes and that Fuentes himself confessed to having done the same, and Rodriguez's recount of the district attorney instructing Fuentes to testify in conformity with his August 16, 1989 statement to the police despite Noel's recantation—would certainly have been admissible at trial and undoubtedly offered if counsel had known of them.

To begin with, Noel's statement that he had lied to authorities about Norton's misconduct would be admissible as a statement against interest, since it would "tend[ ] to subject the declarant [Noel] to . . . criminal liability" pursuant to Fed. R.Evid. 804(b)(3). The other portions of the Noel and Rodriguez affidavits would be admissible for impeachment purposes. Noel's statement that Fuentes told Noel to make up the story about the petitioner, and that Fuentes himself confessed to having invented the story about the petitioner, would be especially relevant to the issue of Fuentes' credibility.

With respect to Rodriguez's assertion that the assistant district attorney and another person "repeatedly t[old] Noel and [Fuentes] exactly what they had to testify to, even after . . . Noel told them that none of it was true, that [Fuentes] had made it all up," (Docket 10, Ex. 5), the respondent has not presented any argument that such

---

4. As will be seen, even if AEDPA did apply to the present case, the court would still allow the petition under its stricter standard.

evidence would be inadmissible at trial, or submitted any affidavit from the assistant district attorney denying this claim. Evidence of this sort of coaching would obviously bear strongly on Fuentes' credibility.

'] Admissible impeachment evidence is "material" under *Brady*. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Indeed, in Massachusetts, a new trial based on non-disclosure of impeachment evidence will be warranted, if "the undisclosed evidence is more credible than any other evidence on the same factual issue and bears directly on a crucial issue before the jury, such as the credibility of an important prosecution witness." *Commonwealth v. Tucceri*, 412 Mass. 401, 589 N.E.2d 1216, 1224 (1992); *see also Zeigler v. Callahan*, 659 F.2d 254, 266–67 (1st Cir.1981).

Here, the information contained in the Noel and Rodriguez affidavits was not in the public record; absent disclosure by the prosecution, there would have been little opportunity for defense counsel to learn of it. Furthermore, the notion that evidence of a recantation by an alleged victim would merely have been "cumulative" strains credulity. Even if much of the evidence at trial was calculated to discredit the victim, there was simply no direct testimony disputing the account of Fuentes, who was the only witness testifying to the alleged criminal activity. Without directly contradictory testimony, the defense was left with much weaker character and circumstantial evidence to undermine Fuentes' credibility. Indeed, the most disturbing aspect of this case is that the evidence concealed by the Commonwealth (if such concealment occurred) not only would have powerfully compromised the prosecutor's ability to prove the case beyond a reasonable doubt, but raises the clear possibility that a miscarriage of justice occurred.

The affidavits provide affirmative evidence of the petitioner's actual innocence.

For the reasons outlined above, the court finds that the Noel and Rodriguez affidavits are material and favorable to the petitioner, and do satisfy the first prong of the *Brady* inquiry.

The facts of this case easily meet the second prong of the *Brady* inquiry, *i.e.*, a showing of suppression by the prosecution. Recently, the First Circuit found this prong satisfied where a trial court had reviewed and withheld from the defense potentially exculpatory evidence. *See Ellsworth v. Warden, N.H. State Prison*, 318 F.3d 285 (1st Cir.2003). In this case, the petitioner can make an even stronger argument that the state unlawfully suppressed evidence, since the prosecutor never even discussed Noel's allegations of fraud with the trial judge, much less disclosed such allegations to Norton's counsel.

The final question under *Brady* is whether there is a reasonable likelihood that the outcome of the trial would have been different had the Noel and Rodriguez affidavits been disclosed to the defense. In this case, there is no question that the suppression of this exculpatory evidence "undermines confidence in outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Blackmun, J., concurring).

Since Fuentes was the only witness to testify to the alleged criminal activity, the statements of Noel directly contradicting him would have been particularly valuable in undermining Fuentes' credibility. *See, e.g., United States v. Arnold*, 117 F.3d 1308, 1317–18 (11th Cir.1997) (finding that trial outcome would have been different where tapes not disclosed to defense contained statements contradicting trial testimony of chief government witness); *Johnson v. Nagle*, 58 F.Supp.2d 1303, 1364

(N.D.Ala.1999) (finding that disclosure of the exculpatory information would not likely have resulted in a different outcome, since "information was a surprise to no one, and was in fact consistent with [petitioner's] own story about what happened"), *aff'd,* 256 F.3d 1156 (11th Cir.2001), *cert. denied,* 535 U.S. 926, 122 S.Ct. 1295, 152 L.Ed.2d 208 (2002). As the First Circuit recently observed on similar facts, "Had the jury been presented with [the impeachment evidence], it seems to us far from clear that it would have reached the same conclusion as to [complainant's] credibility." *Ellsworth,* 318 F.3d at 300.

In sum, reviewing the record *de novo,* the court finds that the prosecution's failure to disclose the information contained in the Noel and Rodriguez affidavits violated the petitioner's constitutional rights under *Brady.*

The court also finds that, even if the AEDPA standard of review were to apply, the prosecution's failure to disclose exculpatory evidence would necessitate granting the writ of *habeas corpus.*

As outlined above, under AEDPA, a petitioner must show that the relevant state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was based on "an unreasonable determination of the facts in light of the evidence pre-sented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

In this case, it is hard to know how to approach the analysis under AEDPA because neither the trial judge nor the Massachusetts Appeals Court attempted to weigh the evidence or apply the governing criteria under *Brady.* As noted earlier, when addressing a challenge to the legitimacy of a criminal prosecution based upon a failure to provide exculpatory evidence, courts are obliged to consider whether (1) the evidence discovered is material and favorable to the accused; (2) the evidence was suppressed by the state; and (3) the petitioner was prejudiced by the suppression of evidence and there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

█] Whether this case is viewed as an unreasonable application of clearly established federal law—*i.e.,* a holding utterly inconsistent with *Brady*—or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings—*i.e.,* a finding that the affidavits were necessarily incredible or merely cumulative—the result is the same. The claims of the petitioner fully satisfy the AEDPA standard. Therefore, the court finds that, even under AEDPA, the petitioner would be entitled to relief.[5]

---

**5.** The failure of the prosecution to supply exact dates for the alleged instances of sexual assault and battery, on the other hand, in no way violated the petitioner's constitutional rights. Young accusers are often unable to give specific details regarding time, place, and circumstances of alleged assaults. *See People v. Jones,* 270 Cal.Rptr. 611, 792 P.2d 643 (1990). The SJC addressed this very issue in *Commonwealth v. Kirkpatrick,* 423 Mass. 436, 668 N.E.2d 790, 794 (1996), *cert.* denied, 519 U.S. 1015, 117 S.Ct. 527, 136 L.Ed.2d 413 (1996), finding that the defendant was not unfairly prejudiced where he did not contend "that his defense would have been different had the victim been able to be more precise about the dates and times of the assaults." *Id.* In this case, the petitioner has never contended that his defense would have been different had the Commonwealth provided precise dates of the alleged assaults.

## V. CONCLUSION

Based on the foregoing, the petitioner is entitled, at a minimum, to a hearing at which the court can make findings of fact regarding his allegations that the prosecutor failed to provide exculpatory evidence. Given that the Noel and Rodriguez affidavits are so far entirely unrebutted, the court will issue the petition without an evidentiary hearing, unless the respondent requests one. Counsel for respondent declined to take a position on this point at oral argument.

Unless the respondent requests an evidentiary hearing by April 11, 2003, the court will allow the petition. The court at that time will order petitioner released unless, on or before July 11, 2003, the respondent has instituted proceedings to retry the petitioner. Pending such further proceedings, the petitioner shall not be enlarged on bail, unless ordered released by some court having competent jurisdiction.

A separate order will issue.

### ORDER

For the reasons stated in the accompanying memorandum, the respondent's Motion to Dismiss (Docket No. 20) is hereby DENIED.

The respondent has until April 11, 2003 to request an evidentiary hearing. If no hearing is requested, the petitioner's Motion for a Writ of Habeas Corpus (Docket No. 1) will be allowed. Upon allowance of the petition, the court will order petitioner released unless, on or before July 11, 2003, the respondent has instituted proceedings to retry the petitioner. Pending such further proceedings, the petitioner shall not be enlarged on bail, unless ordered re-

leased by some court having competent jurisdiction.

It is So Ordered.